UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 12 B 44342 |
| ARTURO COLLAZO, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| ROBERT J. SIRAGUSA M.D. EMPLOYEE | ) | |
| TRUST, ROBERT SIRAGUSA, DANA | ) | |
| SIRAGUSA, JULIE SIRAGUSA, and | ) | |
| ROBERT JOSEPH SIRAGUSA | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 13 A 00216 |
| | ) | |
| ARTURO COLLAZO, | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum of Decision**

This Chapter 7 adversary proceeding comes before the Court for judgment after

trial on the question of whether the debtor, Arturo Collazo, committed a fraud that causes

certain of his debts to be excepted from his bankruptcy discharge. The plaintiffs are the

Robert J. Siragusa M.D. Employee Trust ("the Employee Trust"), Dr. Robert Siragusa,

Dana Siragusa, Julie Siragusa, and Robert Joseph Siragusa ("the Siragusas"). The Sira-

gusas allege that they made a series of loans to LLCs owned by Collazo in reliance on his

false representations. For the reasons stated below, the evidence at trial established that

Collazo did indeed obtain one of the loans by fraud, and the resulting debt is nondis-

chargeable, but only as to two of the plaintiffs.

1

**Findings of Fact**

**a. The Chicago loans—2002-03**

In 2001, Julie Siragusa began working as real estate agent at the brokerage firm of Koenig & Strey. There she met Arturo Collazo, a real estate developer who specialized in "flipping" condominium units—that is, purchasing apartment buildings, gutting them, converting their units into condominiums, and selling the converted units. Collazo, together with a colleague, Jon Goldman, sold the converted condo units through Koenig & Strey, and Julie became responsible for marketing some of these units.

Collazo and Goldman's practice was to acquire properties for condo development through separate LLCs formed for the purpose of holding title to the properties. Typically, each LLC was named after the address of the particular property it acquired. For example, the LLC that owned the property on 1210 West Waveland in Chicago, Illinois was named 1210 West Waveland LLC. Collazo and Goldman were the sole members of these LLCs. The LLCs obtained construction loans to acquire the properties and finance their conversion, and the construction lenders were granted mortgages in the condo units. The LLCs hired CG Developments LLC, another Collazo and Goldman-owned entity, to perform the construction work.

At some point in 2002, Julie's father, Dr. Robert Siragusa, became interested in investing in some of Collazo's development projects. Julie conveyed her father's interest to Collazo, and the Collazo discussed with Dr. Siragusa the details of a short-term loan to finance the conversion at 1210 W. Waveland in Chicago. According to Dr. Siragusa, Collazo explained that construction lenders typically required inspection of a project before allowing a draw on the construction loan, and that the purpose of the loan from Dr. Sira-

gusa was to provide the liquidity necessary to engage in construction during these periods of delay in construction financing. Collazo expected the conversion and sale process to be complete in about 18 months. Thereafter, the Siragusa loan would be repaid, with 20% interest, from the proceeds of the sale of the converted condo units. Dr. Siragusa understood, however, that the construction lender was to be paid first. Dr. Siragusa also testified that he and Collazo discussed "price points," an optimum range of prices at which Collazo expected to be able to sell the units for a profit.

Collazo denies that he discussed the specifics of the deal with Dr. Siragusa. Collazo stated that once Julie conveyed Dr. Siragusa's interest in investing, he referred Dr. Siragusa to Goldman, who possessed a greater understanding of the financial side of the business, to negotiate the specific terms of the loan. Collazo testified that he and Goldman had strictly delineated roles and that Collazo himself never discussed finances. Rather, he was "the person on the street" overseeing construction and sales.

However, Collazo admitted that he did discuss price points in his limited conversations with Dr. Siragusa. A discussion of price points and potential profits only makes sense in the context of a broader discussion about repayment of the loan. Therefore, although it is possible that Collazo left some technical details of the loans—such as the exact interest rate and maturity date—to Goldman, Dr. Siragusa's testimony that Collazo explained to him that repayment was to come from the net proceeds of the sale of condo units after payment of the construction lender is entirely credible.

On September 10, 2002, Dr. Siragusa loaned $100,000 to 1210 West Waveland LLC.[1] Dr. Siragusa also directed the Employee Trust, his pension plan, to make a $200,000 loan. 1210 West Waveland LLC issued promissory notes to Dr. Siragusa and the Employee Trust.

The notes were not well drafted. November 31, 2003 is the maturity date of each note. Because there are only 30 days in November, the parties likely intended either November 30 or December 1, 2003 to be the maturity date. The note also lacks a clear repayment provision. Paragraph 5, titled "Payments," provides that after the sale of each unit, the "borrower shall repay be paid [sic] installments as follows," and subparagraph 5(a) provides that the borrower will pay to the lender after the sale of each condo unit an amount equal to the number listed as the "Balance Due Seller" on each Seller's Settlement Statement. "Borrower" is defined in Paragraph 1 as 1210 West Waveland LLC. "Lender," however, is an undefined term. The only sensible interpretation is that "lender" means the "holder" of the note, which is defined in Paragraph 1 as the Employee Trust and Dr. Siragusa, not the construction lender as Goldman argued at trial. The balance due seller is the net proceeds realized by the seller from the sale after deducting payments due to mortgage holders, taxes, and brokers from the gross amount due seller. Therefore, subparagraph 5(a) effectively provides for payment of the construction loan ahead of the note. This is supported by Paragraph 16, which provides for subordination of the holder's right to payment to the rights of the construction lender. Subparagraph 5(b) states that "in all events" the principal and all unpaid and accrued interest shall be payable on the maturity date. Taken

---

[1] Dr. Siragusa included his wife Susan on many of the loans that he made and added her name to his in the loan documentation.

together, the note creates an obligation of repayment periodically from the net proceeds of the sale of the condo units, with a final maturity date independent of the sales.

Dr. Siragusa and the Employee Trust made additional loans to finance three other Collazo developments in Chicago during 2002 and 2003. Dr. Siragusa testified that he and Collazo discussed the price points and repayment of these new loans from the sale of the condo units—as they had prior to the Waveland loan— before each of these loans. Collazo again denied discussing financial details, but he admitted to speaking with Dr. Siragusa about price points. Again, Dr. Siragusa's testimony is more credible.

On September 26, 2002, Dr. Siragusa made a $60,000 loan and the Employee Trust a $140,000 loan to 2801 Seminary LLC to finance the acquisition of the development located at that address. 2801 Seminary LLC issued two promissory notes in substantially the same form as the Waveland notes.

On June 2, 2003, Dr. Siragusa made a $50,000 loan and the Employee Trust a $145,000 loan to 643 Barry LLC. 643 Barry LLC issued two promissory notes to Dr. Siragusa and the Employee Trust. Again, these notes were in substantially the same form as the Waveland and Seminary notes.

Finally, on November 12, 2003, Dr. Siragusa made a $50,000 loan and the Employee Trust a $65,000 loan to 1300 Eddy LLC. Dana Siragusa, Dr. Siragusa's older daughter and a practicing real estate attorney, made a $20,000 loan as part of this investment. Dana was living in Italy at the time, and she decided to make the loan after discussing the investment with Dr. Siragusa. She did not review the note itself. 1300 Eddy LLC issued three notes that were in substantially the same form as the prior notes.

**b. Partial repayment, transfers of unsold condo units and subsequent mortgages—**

**2003-04**

Soon after the last of these notes was issued, Collazo and Goldman began transfer-
ring unsold units out from the borrower-LLCs to other LLCs that they owned and granting
new mortgages on the transferred units. On December 4, 2003, 1210 West Waveland LLC
transferred title of the three remaining unsold units in the Waveland development by quit-
claim deed to an entity called Art-Man Investments LLC, whose sole members were Col-
lazo and Goldman. At the same time, Art-Man granted a mortgage lien on the units to Pri-
vate Bank, the construction lender on the Waveland development. On April 19, 2004, 643
Barry LLC transferred three unsold units in the Barry development to Art-Man. On
August 6, 2004, Art-Man granted a subordinated mortgage lien on the three units to
Rainbo Asset Management Fund to secure an $800,000 note issued by 548 Deming LLC,
another Collazo and Goldman-owned entity. Finally, 2801 Seminary LLC transferred its
interest in one unsold unit in the Seminary development to GoCo Investments LLC on
September 24, 2004.

The purpose of these transfers was to shift assets to LLCs with clean balance sheets
and to shelter the condo units from the claims of any creditors other than construction
lenders, thus preserving the ability of Collazo and Goldman to later leverage the units to
generate what Goldman called a "liquidity event." In other words, the transfers allowed the
condo units to be used at a later date as collateral for additional financing, in case the
original construction loans were insufficient to cover costs, or to obtain new financing for
other development projects. Collazo testified that he did not intend to transfer unsold units

6

at the time the loans were initially made. This is credible, given that it was a strategy formulated in response to slow sales and the need for additional financing. There is no indication that Collazo anticipated sluggish sales at the time the loans were made.

In the midst of the transfers to new LLCs, on June 30, 2004, 1210 West Waveland LLC made full payment of its notes to Dr. Siragusa and the Employee Trust. The notes were nearly 8 months past due at the time of payment. By this time, 1210 West Waveland LLC had effectively been rendered judgment proof by the transfer of the unsold Waveland units to Art-Man. Partial payment was made on the Seminary notes on December 11, 2004. The notes were also 8 months past due at that point, and 2801 Seminary LLC had also been rendered judgment-proof by the transfer of its one unsold unit to GoCo.

By early 2005, although the Waveland notes had been paid in full and the Seminary notes had been partially paid, the Barry and Eddy notes were in default. When Dr. Siragusa pressed Collazo for an update on the status of the loans, Collazo informed him that the developments had encountered construction delays. Collazo denies that Dr. Siragusa ever questioned him about payment, but this is not credible. The status of substantial unpaid loans would very likely have been an issue that Dr. Siragusa would discuss with Collazo, since Collazo was the man with whom Dr. Siragusa had initially discussed the loans.

All of the borrower-LLCs, with the exception of 1300 Eddy LLC, had been stripped of their assets and had no ability to pay their obligations by this time. The unsold units were then utilized to trigger "liquidity events." On March 16, 2005, Art-Man granted a new mortgage on the Waveland and Barry units to Cole Taylor Bank and a subordinated mortgage on the same units to Rainbo Assets. GoCo also granted a new mortgage on the Seminary unit to Cole Taylor. The March 16 mortgages stated that they were granted to

secure a revolving line of credit not to exceed $11.9 million. The units were packaged with unsold units in other developments. Given the size of the loan, the unsold units in the Waveland, Barry, and Seminary developments alone would not have provided sufficient security.

On May 16, 2005, 1300 Eddy sold one unit generating a profit of $387,101.32. The proceeds of this sale were not applied to the Eddy notes. Then, on July 1, 2005, 1300 Eddy LLC transferred title in three unsold Eddy units by quitclaim deed to PRJ Properties LLC, another Collazo and Goldman-owned entity. Finally, PRJ granted a new mortgage on these units to Cole Taylor.

Art-Man, GoCo, and PRJ now held title to all of the unsold units in the Waveland, Barry, Seminary, and Eddy developments. These entities owed no obligations to any of the Siragusas. All borrower-LLCs were now asset-less, and mortgages, and frequently, second mortgages, had been granted on all unsold condo units in order to secure a large amount of new lending.

**c. The Arizona Loan--2005**

Despite the fact that payment had been made on only a portion of the Siragusas' loans for the Chicago project, Collazo obtained a loan from the Employee Trust, Dana, Julie, and Dr. Siragusa's son, Robert Joseph, in November 2005 to finance a large new development project in Arizona. Dr. Siragusa, Dana, and Julie testified that they met with Collazo and Goldman to discuss a family investment in the Arizona development. In addition to the usual presentation of price points and sales projections, Dr. Siragusa and Julie testified that Collazo and Goldman stated that the Chicago loans would be repaid after the

sale of the remaining condo units in the Chicago developments and that they expected this to occur within 30 to 60 days.[2]

Neither Collazo nor Goldman informed the Siragusas that all unsold units had been transferred to entities that owed no obligation to Dr. Siragusa, that other lenders had superior rights as to all units, or that net proceeds from other sales had been diverted to new investments. Dr. Siragusa and Dana testified that they would not have invested in the Arizona development if they had been made aware of these facts.

Collazo and Goldman deny that there was any discussion about the repayment of the Chicago loans at the time of the Arizona deal. They also allege that Dr. Siragusa was aware of the transfer of unsold units, that there had been active discussions with Julie regarding a rollover of the unpaid balance of the Chicago loans into the Arizona development, and that a rollover was, in fact, agreed to by Julie on behalf of her father. Julie denies agreeing to such an arrangement.

Collazo and Goldman's testimony that there was a rollover of unpaid balances into the Arizona loan is not credible. No document memorializing this alleged agreement was ever drafted. Furthermore, the Siragusas continued to maintain an interest in the sale of the condo units even after the Arizona loan, as discussed below.

On November 22, 2005, CG Development issued a $200,000 note to Dana, Julie, and Robert Joseph. CG Development also issued an $800,000 note to the Employee Trust. Both notes promised 20% interest and were set to mature in November 2007. Collazo and

---

[2] Given that Dana was present at this meeting, this representation must also have been made to her. Dana's testimony that she would not have made the loan if she had known at the time the borrower-LLCs did not have the ability to repay the loans also indicates that she understood at the time that the Chicago loans were to be repaid from sales of the condo units.

Goldman also pledged their membership shares in 1755 Damen LLC, which held title to a large property with that address in Chicago, Illinois, to the Siragusas as security.

Although the final notes were issued by CG Development, CG Development never actually purchased the Arizona development. Instead, the ultimate purchaser of the property was Meridian Corners LLC, another Collazo and Goldman-owned entity. Goldman testified that the mortgage lender specifically required that a Delaware LLC hold title to the property, and therefore, CG Development could not actually purchase the property. Meridian Corners issued no notes to the Siragusas or the Employee Trust, and therefore, the entity that actually owned the development again owed no obligation to them.

### d. Sales of Chicago condo units – 2006-2008

Collazo began selling off the ten remaining Chicago units in August 2006, succeeding in selling the last unit in February 2008. However, because the units were encumbered with significant mortgage debt, most of the sales did not return any net proceeds, despite the fact that they were sold at or above the price points that Collazo had targeted. Only the sale of the Eddy units, which had not been encumbered by a second mortgage, yielded net proceeds, but only about $55,000, a fraction of the amount owed on the Eddy notes. No payments were made to the Siragusas after any of these sales.

Dr. Siragusa was aware of at least one of these sales. Julie testified that she brokered the sale of the last Eddy unit in July 2007 and that she contacted Dr. Siragusa afterwards to celebrate her sale. Julie alleged that Dr. Siragusa reacted negatively to the news, telling her that he was invested in the Eddy development and that she needed to tell him when the units were sold. Julie stated that Dr. Siragusa then followed up directly with Collazo and Goldman regarding repayment. Dr. Siragusa denied ever having this conversa-

tion with Julie. Julie's testimony is the more credible given the specificity of her testimony and the entirely believable context—a daughter sharing the news of a successful business transaction with her father.

The Arizona notes matured on November 27, 2007. CG Development failed to pay the note. In the summer of 2008, Dana began interacting directly with Collazo and Goldman regarding repayment of the outstanding debts. Dr. Siragusa testified that he did not take an active role in the discussions because his wife had contracted a serious illness and he had become preoccupied with her care. Sometime during this period, the construction lender of the Arizona development began pressing Collazo and Goldman for additional collateral in order to cover the deteriorating value of the Arizona property following the collapse of the real estate market in that state. Eventually, the lender accepted a deed in lieu of foreclosure.

In January 2009, Dana received a settlement proposal from Collazo and Goldman that provided for payments from the sale of condo units. Dana was alarmed by the fact that the units were in developments that neither she nor her father had ever invested in. Dana discovered after a record search that the borrower LLCs had transferred their units to entities that owed no obligations to her father and that those entities had already sold the units.

Based on this discovery, the Siragusas attempted to settle the debt with Collazo and negotiate a forbearance and tolling agreement. However, the parties never entered into a forbearance agreement and no tolling provision went into effect. Collazo filed for bankruptcy on November 7, 2012, and the Employee Trust, Dana, Julie, Robert Joseph, and Dr. Siragusa filed proofs of claim against the estate for fraud and contractual debts under the

promissory notes. The Employee Trust and the Siragusas then filed this adversary complaint to determine the dischargeability under 11 U.S.C. § 523(a)(2)(A) of a debt for money obtained by false pretenses, false representation, or actual fraud.

## Jurisdiction

This court has jurisdiction to hear this adversary proceeding pursuant to 28 U.S.C. § 1334(a–b), 28 U.S.C. § 157(a), (b)(1–2), and General Rule 2.33(a) of the United States District Court for the Northern District of Illinois. This proceeding is a core matter under 28 U.S.C. § 157(b)(2)(I) and (O).

## Conclusions of Law

Based on the facts set out above, the debts owed to Dana and Robert Joseph arising from the Arizona loan are nondischargeable under 11 U.S.C. § 523(a)(2)(A). However, the debt owed to Julie and the Employee Trust arising from the Arizona loan and all debts arising from the Chicago loans are dischargeable.

### a. Collazo's personal liability

As a threshold matter, Collazo asserts that he cannot be held personally liable for debts actually incurred by the borrower-LLCs. Collazo argues, therefore, that there is no underlying debt owed for any of the loans unless the Siragusas and the Employee Trust can prove the necessity of piercing the LLC veil.[3] Moreover, Collazo argues that veil piercing is the sort of state law claim that bankruptcy courts lack the authority to adjudicate. *Stern v. Marshall*, 131 S.Ct. 2594 (2011). For the following reasons, Collazo's arguments are not well founded.

---

[3] This can also be characterized as an argument that Collazo never "obtained" money as required by 11 U.S.C. § 523(a)(2)(A).

The only case Collazo cites in favor of this proposition is *In re Tomlinson*, 1999 WL 294879, at *7 (Bankr. N.D. Ill. 1999). But *Tomlinson* actually reaches the opposite conclusion, that the defendant can owe a debt to the plaintiff even if he did not personally receive any money, as long as he receives some benefit from his fraud. As is the situation here, the defendant in *Tomlinson* argued that he did not owe a debt to the plaintiff because he never personally received funds and because he was not personally obligated under any agreement with the plaintiff. The court disagreed and concluded that the transfers had benefitted companies in which the defendant owned an interest, and therefore, that he would owe a debt to the plaintiff on account of any fraud he committed. *Id.* at *10. The same applies here. Although Collazo did not receive any funds from the Siragusas, the LLCs in which he held a 50% interest clearly benefitted from the loans. Therefore, Collazo benefitted personally from the loan and cannot now argue that he is immune from liability.

It is true that the Siragusas cannot assert Collazo's liability on the basis of the contractual obligation of the borrower-LLCs without proving the necessity for piercing the LLC veil. However, the Siragusas and the Employee Trust assert common law fraud claims based on specific representations made by Collazo. These are claims based solely on Collazo's personal conduct and do not relate to the obligations of the borrower-LLCs.

Finally, dischargeability determinations are core proceedings. *Matter of Hallahan*, 931 F.2d 1496, 1505 (7th Cir. 1991). Even Collazo concedes that the bankruptcy courts have the constitutional authority to adjudicate dischargeability. This adversary proceeding is limited to the determination of dischargeability. It does not implicate *Stern v. Marshall*.

**b. Statute of limitations**

Collazo also asserts a statute of limitations defense, arguing that the statue of limitations on fraud claims applicable under Illinois law expired before he filed for bankruptcy on November 7, 2012. The statute of limitations is an affirmative defense, and therefore, it must be asserted and proven by the defendant. *Sanders v. Merchants' State Bank of Centralia*, 182 N.E. 897, 903 (Ill. 1932). Although Collazo only argued that the statute of limitations defense applied to the Chicago loans in his post-trial brief, he asserted the affirmative defense generally as to all claims in his answer. For the following reasons, Collazo's argument is well founded as to the claims of Dr. Siragusa, the Employee Trust, and Julie, but not as to the claims of Dana and Robert Joseph.

A five-year statute of limitations applies to fraud claims under 735 ILCS 5/13-205. *McCarter v. State Farm Mutual Auto Insurance Co.*, 473 N.E.2d 1015, 1018 (Ill. App. 1985).[4] Illinois applies the "discovery rule" with respect to fraud claims, meaning that the cause of action accrues and the statute of limitations begins to run only when a plaintiff knows or reasonably should know that an injury occurred and that the defendant wrongfully caused the injury. *Knox College v. Celotex Corp.*, 430 N.E.2d 976, 980 (Ill. 1981). The plaintiff should know that an injury is wrongfully caused when he possesses "enough information about the injury to alert a reasonable person to the need for further inquiries to determine if the cause of the injury is actionable at law." *Joyce v. Morgan Stanley & Co.*, 538 F.3d 797, 803 (7th Cir. 2008); *see also Nolan v. Johns-Manville Asbestos*, 421 N.E.2d

---

[4] A ten-year statute of limitations applies to actions on promissory notes. 735 ILCS 5/13-206. However, the ten-year provision cannot apply here because the promissory notes were issued by the borrower-LLCs, not Collazo. Because the Siragusas and the Employee Trust cannot assert a claim against Collazo on the basis of the promissory notes, only the five-year statute of limitations applicable to fraud actions applies here.

14

864, 868 (Ill. 1981) (information providing notice of wrongdoing creates a duty of inquiry).

The Siragusas' causes of action for fraud did not accrue when the alleged false representations were made before each loan. Although the injury would have been complete when the Siragusas transferred cash to the borrower-LLCs in reliance of the allegedly false representations, the Siragusas did not possess enough information about the injury or its wrongful cause at the time of the loans to trigger the statute of limitations under the discovery rule.

Collazo argues that causes of action accrued on the maturity dates of each individual note because this is when the Siragusas had enough information to alert them of the need to inquire further. However, the default alone did not constitute sufficient notice of wrongful conduct.[5] As far as the Siragusas were concerned, the notes had not been paid because there were still unsold units in each of the developments and the respective construction lenders had not been paid in full. They had no reason to suspect in 2004 and 2005, when the notes matured, that Collazo had fraudulently induced them to enter into the loans. Therefore, Collazo's failure to pay the notes upon maturity was not sufficient to trigger the statute of limitations.

The Siragusas assert that they did not become aware of any potential wrongdoing until January 2009, when Dana discovered that the borrower-LLCs had transferred title to the unsold units and that Collazo and Goldman had granted new mortgages on these units following the transfers. They contend, therefore, that the statute of limitations did not be-

---

[5] Nor was default a necessary condition of discovery. As discussed in more detail below, the Dr. Siragusa obtained sufficient information of the injury and its wrongful cause even before the default of the Arizona note.

15

gin running until January 2009, meaning that the statute of limitations would not have ex-

pired by the time Collazo filed his bankruptcy case in November 2012.

In fact, the evidence shows that Dr. Siragusa had notice of actionable conduct relat-

ing to both the Chicago and Arizona loans well before Dana's discovery in January 2009.

Julie informed Dr. Siragusa in July 2007 that she had sold the last Eddy unit.  Dr. Siragusa

would have realized after this conversation that he had not been repaid after the sale of the

Eddy units as promised.  This would have given Dr. Siragusa notice that the representa-

tions made by Collazo before both the Chicago and Arizona loans—that Dr. Siragusa

would be repaid from the sale of unsold condo units—were potentially false.  If Dr. Sira-

gusa had inquired further, he could have discovered what Dana eventually discovered in

2009: that Collazo had been selling the units without paying Dr. Siragusa and the Em-

ployee Trust since August 2006.  Therefore, as to Dr. Siragusa and the Employee Trust,

there was sufficient notice in July 2007 to trigger the statute of limitations as to both the

Chicago and Arizona loans.

The statute of limitations also began running in July 2007 with respect to Julie's

claim because she had sufficient notice of actionable conduct before her conversation with

Dr. Siragusa.  Even assuming that she had been unaware of Collazo's activities up to this

point, she had notice that the representations Collazo made before the Arizona loan were

potentially false at the time she talked to her father about her sale of the Eddy unit.

The Siragusas contend that even if the statue of limitations began to run before

January 2009, Collazo fraudulently concealed their cause of action by convincing the Sira-

gusas that they would be repaid as soon as the remaining units were sold, making partial

payment of some of the notes, and engaging in protracted settlement negotiations.  There-

16

fore, the Siragusas argue that the statute of limitations was tolled by operation 735 ILCS 5/13-215, which gives the plaintiff five years after the discovery of the defendant's concealment to bring a cause of action.

However, Illinois courts have declined to apply Section 13-215 where the plaintiff discovered the defendant's concealment before the expiration of the applicable statute of limitations period and "reasonable time" remained in the limitations period for the plaintiff to bring a cause of action. *Morris v. Margulis*, 754 N.Ed.2d 314, 319 (Ill. 2001); *Anderson v. Wagner*, 402 N.E.2d 560, 573 (1979). Courts have also declined to toll the statute of limitations where the plaintiff should have discovered the concealment through the exercise of ordinary diligence with reasonable time remaining in the applicable limitations period. *Smith v. Cook County Hospital*, 518 N.E.2d 336, 340 (Ill. App. 1987); *Real v. Kim*, 445 N.E.2d 783, 789 (Ill. App. 1983). Courts have found a period as short as five and a half months to be reasonable time to bring a cause of action. *Brown v. Mason*, 477 N.E.2d 61, 64 (Ill. App. 1985).

Section 13-215 does not apply here. Even assuming that Collazo had fraudulently concealed the cause of action, Dr. Siragusa and Julie should have discovered the alleged concealment through the exercise of ordinary diligence in July 2007. At that point, Dr. Siragusa and Julie had notice of potential wrongdoing, and they could have discovered the truth about the transfers and sales, as Dana eventually did in 2009. Actual discovery of the concealment occurred no later than January 2009, when the truth was uncovered through the course of Dana's investigation. At that point, Dr. Siragusa and Julie still had three years to bring a cause of action. Because of this significant time, any alleged fraudulent concealment could not have tolled the statute of limitations.

The claims of Dr. Siragusa, Julie, and the Employee Trust were therefore time-barred as of July 2012. However, the statute of limitations defense fails with respect to the claims of Dana and Robert Joseph, because there is no evidence that they were aware of any sale of the condo units before January 2009. Therefore, the statute of limitations did not begin running for their claims until Dana's discovery in January 2009.

### c. False representation, false pretenses, actual fraud under § 523(a)(2)(A)

The surviving claims are Dana's claim for fraud arising from the Eddy loan and the claim of Dana and Robert Joseph for fraud arising from the Arizona loan.

11 U.S.C. § 523(a)(2)(A) excepts from discharge any debt for money obtained by "false pretenses, false representations, or actual fraud." In order to prevail under 11 U.S.C. § 523(a)(2)(A), the plaintiff must show (1) that the defendant made a false representation or omission, (2) that the defendant knew the representation was false or made with reckless disregard for the truth, (3) that the defendant made the representation or omission with the intent to deceive, and (4) that the plaintiff justifiably relied on the defendant's representation or omission. *Ojeda v. Goldberg*, 599 F.3d 712, 716-717 (7th Cir. 2010). In order to be actionable, the alleged fraud must have existed at the time the debt was incurred, meaning that the plaintiff must prove that all elements of the nondischargeability claim were satisfied at the time the debt was created. *In re Scarlata*, 127 B.R. 1004, 1010 (N.D. Ill. 1991). The plaintiff must prove each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

For the following reasons, Dana failed to meet her burden of proof as to the Eddy loan, and therefore, the debt arising from that transaction is dischargeable. However, Dana and Robert Joseph did establish the elements of nondischargeability as to the Arizona loan.

**i. Dischargeability of the Chicago loans**

Dana's fraud claim arising from the Eddy loan is dischargeable because she failed to prove at trial that Collazo's representation—that the note would be paid from the sale proceeds of condo units after the construction lender had been paid in full—was false at the time it was made. For the same reason, the claims of Dr. Siragusa and the Employee Trust arising from the Chicago loans would similarly be dischargeable even if the statute of limitations defense did not apply.

The only evidence dating back to the time of the loans are the notes issued by the borrower-LLCs. Although the language of the notes was ambiguous, they created an obligation to repay Dr. Siragusa, Dana, and the Employee Trust from the sale of the condo units. The notes also stated that the right to payment was subordinate to the rights of the construction lenders. Furthermore, at the time the Eddy note was issued in November 2003, Collazo had still not transferred any condo units out of the borrower-LLCs. There is no evidence that Collazo did not intend to repay the loan in accordance with the terms stated in the note.

**ii. Dischargeability of the Arizona loan**

Dana and Robert Joseph have met their burden of proving all the elements of non-dischargeability with respect to the Arizona loan, and had the statute of limitations not provided a defense, the Employee Trust would similarly have prevailed on its claim as to the Arizona loan.

The evidence shows that Collazo made a false representation at the time of the Arizona loan in November 2005. Collazo stated to the Siragusas before the Arizona loan was made that the Chicago loans would be repaid within 30 to 60 days from the sale of the un-

sold condo units. This statement was false at the time the debt was incurred. Contrary to the representation, Collazo and Goldman had already transferred the unsold units to non-borrower entities and had also granted first and second mortgages on the units in order to secure new debts. This essentially made repayment impossible because the units had been encumbered by significant mortgage debt— $800,000 to Rainbo Assets and up to $11.9 million to Cole Taylor. In addition, 1300 Eddy LLC also sold a unit in May 2005 and realized a profit of $387,101.32 from the sale. However, it failed to pay the Eddy notes, which were in default at this point. This also indicates that Collazo had no intention of paying the Chicago loans from the sale of the condo units when the representation was made because he had already failed to pay when there were ample funds to do so.

Collazo also knew that the statement was false at the time or, at the very least, the statement was made with reckless disregard for the truth. Although he feigned ignorance at trial by claiming that he was simply "the person on the street," Collazo was not ignorant of the financial aspects of the business. In fact, Collazo admitted that he calculated and discussed with Dr. Siragusa the "price point" at which the sale of a condo would generate profit and a return to Dr. Siragusa. Collazo could not do this without understanding how much would be owed to the mortgage lenders at closing. This indicates that Collazo possessed a greater understanding of the financial aspects of his business than he acknowledged. Collazo certainly knew at the time the representation was made that it would be impossible to repay the Chicago loans from the sale of the remaining condo units. Also, as the "person on the street" supervising the sale of condos, he was aware of the sale of the Eddy unit in May 2005.

Collazo also made the representation with the intent to deceive. Intent may be proven by inference from the defendant's activities. *In re Malcolm*, 145 B.R. 259, 263-64 (Bankr. N.D. Ill. 1992). Such an inference can be made here. Collazo took part in a series of transactions that rendered the borrower-LLCs incapable of repaying the Chicago loans. Collazo also failed to inform the Siragusas of this material fact before they made the Arizona loan. Therefore, the representation must have been made with the intent to deceive and induce the Siragusas into making the Arizona loan.

Finally, Dana and Robert Joseph justifiably relied on Collazo's representation. Justifiable reliance only requires that the plaintiff did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized the opportunity to make a cursory examination or investigation." *Field v. Mans*, 516 U.S. 59, 71 (1995). However, the plaintiff has no duty to investigate if he is unaware of a potential falsity. *Ojeda*, 599 F.3d at 718; *see also Field*, 516 U.S. at 70-71. Justifiable reliance is a less demanding standard than reasonable reliance. It is a subjective, rather than objective, standard. *Ojeda*, 599 F.3d at 717.

There was sufficient justification for relying on Collazo's representation in November 2005. Payment had been made on the Waveland and Seminary notes in 2004, and Collazo had related to Dr. Siragusa a plausible explanation that the default had been caused by delays in construction. Therefore, there was a justifiable hope that the other notes would be repaid as soon as the remaining units were sold. Moreover, there was no indication that Dana and Robert were aware of the potential falsity of Collazo's representations at the time they were made. As far as they knew, no units had been sold and there was suf-

ficient equity in the unsold units to pay their loans. Therefore, there was no duty to inves-
tigate the truthfulness of the representations.

Finally, Dana and Robert Joseph have established that a debt arose from Collazo's
false representation. *In re Scarpello*, 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002) (noting that
the misrepresentation must be the factual cause of the debt); *see also In re Glenn*, 502 B.R.
516, 531 (Bankr. N.D. Ill. 2013). Relying on Collazo's false representation, Dana and
Robert Joseph transferred $200,000 to a Collazo-owned LLC for his benefit, and none of
this has been returned to them. Therefore, there is a debt owed to Dana and Robert Joseph,
and it was, in fact, caused by Collazo's false representation.

Because Dana and Robert Joseph have met the burden of establishing the elements
of 11 U.S.C. § 523(a)(2)(A), the debt arising from the Arizona loan is nondischargeable.

## Conclusion

For the reasons stated above, the court finds that the claim of Dana and Robert Jo-
seph arising from the Arizona loan are excepted from discharge under 11 U.S.C.
§ 523(a)(2)(A). However, the claims of Julie and the Employee Trust arising from the
Arizona loan and all debts arising from the Chicago loans are not excepted from discharge.

Dated: March 5, 2014

Eugene R. Wedoff
United States Bankruptcy Judge